**PROFESSIONAL PROPERTY SERVICES, INC.,**
Plaintiff,

v.

**AGLER GREEN TOWNHOUSES, INC., et al., Defendants.**

No. C2:95 CV 00916.

United States District Court,
S.D. Ohio,
Eastern Division.

March 27, 1998.

James Scott Mowery, Jr., Judith E. Galeano, Mowery and Youell, Worthington, OH, Carl G. Becker, Becker & Gibson, Pontiac, MI, for Plaintiff.

Fred Thomas, Jr., Gilda L. Spencer, U.S. Attorney's Office, John Willie Waddy, Jr., Law Offices of John W. Waddy, Jr., Columbus, OH, for Defendants.

## OPINION AND ORDER

MARBLEY, District Judge.

### INTRODUCTION

This matter comes before the Court on Defendants' Motions for Summary Judgment. Plaintiff filed this action against Defendants seeking damages, injunctive, declaratory and mandamus relief for breach of contract. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

For the reasons set forth below, Defendants' Motions for Summary Judgment are **GRANTED.**

## FACTUAL BACKGROUND

Agler Green Townhouses, Inc. ("Agler Green"), an Ohio non-profit corporation, is the owner of a Fair Housing Act ("FHA") insured multi-family development in Columbus called Agler Green Cooperative. In order to comply with the requirements of the FHA mortgage guarantee, Agler Green executed a Regulatory Agreement with HUD, which outlined certain rights and monitoring obligations for HUD.

Around November 1, 1992, the Agler Green Board of Directors voted to contract out for a two year period the property management services for the Agler Green Cooperative to Professional Property Services, Inc. ("PPS"), a Michigan corporation. At that time, Agler Green and PPS were aware that PPS was not licensed to manage real estate property in Ohio. In order to remedy this problem, PPS entered into a joint venture with an Ohio corporation, Sales Plus Management, Inc. ("Sales Plus"), which was licensed to manage real estate property in Ohio. Counsel for PPS drafted a Joint Venture Agreement specifically for the Agler Green project, wherein PPS was responsible for handling the real estate management, and Sales Plus was responsible for maintaining a valid broker's license under Ohio law. This Joint Venture Agreement was executed on December 3, 1992, after counsel for Agler Green had reviewed the agreement.

On January 15, 1993, Agler Green and PPS entered into a Housing Management Agreement wherein PPS agreed to provide property management services for a fee. HUD was not a signatory to the contract, but certain provisions of the contract referred to various rights of HUD and obligations of the parties to HUD. It is undisputed that PPS was aware of HUD's participation in the project.[1] After almost two years of service,

the contract was extended through January 15, 1998.

On April 21, 1995, PPS received a letter via facsimile from the Real Estate Division of the Ohio Department of Commerce contending that neither PPS, nor its joint venture, was licensed to manage real estate property in Ohio. The letter instructed PPS to do one of two things: (1) cease and desist all real estate management activities in the state of Ohio; or (2) obtain a broker's license under Ohio law. Shortly thereafter, on May 2, 1995, counsel for Agler Green sent a letter informing PPS that it was in breach of the terms of the Housing Management Agreement. Later that same day, an Ohio broker by the name of Jeryll Womack transferred her real estate broker's license to PPS, which allowed PPS to manage property in Ohio. At that time, PPS also terminated the Joint Venture Agreement with Sales Plus. Both Agler Green and HUD were informed of this transaction, and all parties continued to operate as they had before PPS received the "cease and desist" letter.

Because HUD was not satisfied that PPS's licensing problem had been adequately remedied, on July 21, 1995, G. Alan Coupland of HUD sent a letter (dated July 24, 1995) via facsimile to both PPS and Agler Green informing the parties of HUD's decision to terminate the Housing Management Agreement effective September 30, 1995. It is undisputed that the parties received this letter via facsimile on July 21, 1995.

Pursuant to its obligations under the Regulatory Agreement, on July 22, 1995, after Agler Green received HUD's termination letter, its Board of Trustees voted to also terminate the Housing Management Agreement with PPS.[2] The Board also approved a Housing Management Agreement with a company named Nelson and Associates, which agreed to perform the same services as PPS had been performing.

---

1. PPS concedes in its Memorandum that it was required to complete paperwork for HUD during the contracting process.

2. While Agler Green's initial letter to PPS informing it of the termination specified an August 31, 1995 effective date, that date was revised in a later letter to conform with the September 30, 1995 date identified by HUD.

## LEGAL ANALYSIS

### I. Standard For Summary Judgment

Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (Summary judgment appropriate where the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating such a motion, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995). In this case, the parties bring before this Court issues of law upon which the parties disagree, but which do not involve any genuine disputes of material facts.

### II. Validity of the Agler Green–PPS Contract

■ Agler Green argues that PPS has no cause of action against it because PPS's failure to be properly licensed under Ohio law prior to May 2, 1995 rendered the Housing Management Agreement illegal, and therefore, void *ab initio.* The validity of the Agler Green–PPS contract is to be determined according to the substantive law of Ohio. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). "It is elementary that no valid contract may be made contrary to statute, and that valid, applicable statutory provisions are part of every contract." *Bell v. Northern Ohio Telephone Co.,* 149 Ohio St. 157, 158, 78 N.E.2d 42, 43 (1948). *See also, Eastern Machinery Co. v. Peck,* 161 Ohio St. 1, 117 N.E.2d 593 (1954); *Goudy v. Gebhart,* 1 Ohio St. 262, 265, 1853 WL 26 (1853) ("No Court will lend its aid to a man who founds his cause of action upon an ... illegal act ... a court of justice leaves the parties [to an illegal agreement] as it finds them.").

■ The rule is well established in Ohio that a contract made in violation of a statutory prohibition designed for police or regulatory purposes is void and confers no rights upon the wrongdoer. *Buchanan Bridge Co. v. Campbell,* 60 Ohio St. 406, 54 N.E. 372 (1899); *Ludwig Hommel & Co. v. Incorporated Village of Woodsfield,* 122 Ohio St. 148, 171 N.E. 23 (1930); *see also,* 6A Arthur L. Corbin, *Corbin on Contracts* § 1374 (1962). Therefore, under Ohio law, if the Housing Management Agreement was illegal, it is void, and PPS has no cause of action in a court of law to enforce that Agreement.

Under Ohio law, no person, partnership, association, or corporation shall act as a real estate broker without first being licensed according to the laws of Ohio. Ohio Rev.Code Ann. § 4735.02 (Banks–Baldwin 1995). A "real estate broker" is defined as "any person, partnership, association, or corporation, foreign or domestic, who for another ... operates, manages, or rents, or offers to operate, manage, or rent any building or portions of buildings to the public as tenants ..." Ohio Rev.Code Ann. § 4735.01 (Banks–Baldwin 1995). An association must have at

least one individual broker affiliated with it, and only that individual broker may act as a "real estate broker" on behalf of and in the name of the association. Ohio Admin.Code § 1301:5–1–03 (1997). Even more importantly, the terms of the Joint Venture Agreement are in direct contravention of another provision of the Ohio Administrative Code. In relevant part, the Administrative Code provides:

> (A) No arrangement, direct or indirect, shall be entered into by any licensee whereby an individual licensee lends his or her name or license for the benefit of another person, form, or corporation, or whereby the provisions of the real estate license laws or regulations are circumvented.
>
> (B) Lending a broker's license for the benefit of another person, form or corporation shall be construed as including any arrangement whereby a broker fails to personally oversee and direct the operations of the business of which he or she is licensed as the sole broker.

Ohio Admin.Code § 1301:5–1–14 (1997).

 The Court finds that the Joint Venture Agreement between PPS and Sales Plus failed to satisfy the real estate licensing requirements of Ohio law. PPS and Sales Plus entered into a Joint Venture Agreement for the express purpose of "managing the real estate complex known as Agler Green Cooperative located in Columbus, Ohio." The Joint Venture Agreement provided for the following delineation of responsibilities between PPS and Sales Plus:

> It is hereby agreed that the following shall be the responsibility of Professional Property Services, Inc.:
>
> **To engage in such management activities and to employ such employees as are necessary to perform such management duties as required to satisfy the terms of the management contract to be entered into for the management of Agler Green Cooperative.** To pay the compensation to Sales Plus Manage-

ment, Inc., on a monthly basis, as agreed between the parties, for services rendered

It is hereby agreed that the following shall be the responsibility of Sales Plus Management, Inc.:

> To maintain in full force and effect a real estate broker's license in the State of Ohio throughout the period of this Joint Venture Agreement.

Joint Venture Agreement, ¶ 6.1 (emphasis added).

The express terms of the Joint Venture Agreement demonstrate that PPS intended to be a real estate broker as defined by Ohio statutory law. Moreover, under the Joint Venture Agreement, PPS, not Sales Plus, was responsible for management of the Agler Green Cooperative. Only Sales Plus, however, was authorized under § 1301:5–1–03 of the Ohio Administrative Code to manage the Agler Green property, and the lending of its license to PPS through the Joint Venture Agreement violated § 1301:5–1–14. Because the Joint Venture Agreement did not comply with Ohio statutory law, PPS was not properly licensed under Ohio law to manage the Agler Green Cooperative under the Housing Management Agreement. That Agreement, therefore, failed to comply with Ohio law, and is void and unenforceable.[3] *See Bell,* 149 Ohio St. at 158, 78 N.E.2d 42; *Goudy,* 1 Ohio St. at 265. Thus, PPS has no right to recover for an alleged breach of the Housing Management Agreement. On this basis alone, all of PPS's claims for damages, declaratory, injunctive, and mandamus relief premised upon this Agreement would be dismissed, and Summary Judgment would lie for Defendants.

PPS argues, however, that even if it was not properly licensed to manage real estate, the contract is voidable, not void, under the Restatement (Second) of Contracts § 152 (contract is voidable where a mistake by both parties as to a basic element of a contract has a material effect on exchange of performances) *and* § 380 (a voidable contract is

---

**3.** Indeed, PPS effectively admitted that the Joint Venture Agreement was in violation of Ohio law when, upon receipt of the letter from the Ohio Department of Commerce, PPS terminated the Joint Venture Agreement and negotiated the transfer of Womack's license.

ratified if a party cures its defect and the other party accepts performance after the cure). See Restatement (Second) of Contracts §§ 152, 380 (1981). Essentially, PPS argues that the mutual mistaken belief of the parties that PPS was properly licensed at the time of contracting, and thereafter, rendered the contract voidable. In addition, PPS argues that the contract was later ratified when Agler Green accepted performance by PPS following Womack's license transfer.

PPS also argues that after May 2, 1995, when PPS became properly licensed, the parties course of conduct created a binding new implied contract which was neither void nor voidable. It is undisputed that PPS continued to manage the Agler Green Cooperative following the license transfer on May 2, 1995.[4] Furthermore, counsel for Agler Green represented to the Court at oral argument that Agler Green continued to pay PPS for property management services rendered until the end of the contract. Moreover, all evidence indicates that the parties continued to operate under the terms and conditions of the Housing Management Agreement.

This Court need not address these arguments, however, because even PPS agrees that, if the contract was merely voidable and later ratified, or if an implied contract was created, the terms of the contract "were identical" to those previously agreed to in the Housing Management Agreement. Thus, the only remaining questions are whether HUD and Agler had the authority under the terms of the Housing Management Agreement to terminate that Agreement.

### III. The Propriety of HUD's Termination of the Agler Green – PPS Contract

Paragraph 27(c) of the Housing Management Agreement between Agler Green and PPS, provided in relevant part:

It is expressly understood and agreed upon by and between the Principal Parties that *the Secretary or Mortgagee shall have the right to terminate this Agreement at the end of any calendar month, with or without cause,* on a thirty (30) day advance written notice to each of the Principal Parties ...

(emphasis added). The "Principal Parties" referred to above are defined as "the Owner and the Agent," who are, in turn, Agler Green and PPS, respectively. The "Secretary" is defined as the Secretary of the U.S. Department of Housing and Urban Development.

■ The Court finds that, as a matter of law, HUD acted within its rights when it terminated the Agler Green–PPS contract on July 21, 1995. It is clear from the express language of paragraph 27(c) that HUD possessed the power to terminate the Agler Green–PPS contract without cause, provided that HUD gave the parties thirty (30) days advance notice. In the present matter, it is undisputed that HUD faxed the termination letter seventy (70) days prior to the effective date of termination. The only question that remains is whether Coupland was authorized by HUD to execute the termination.

PPS argues that Coupland's deposition testimony demonstrates that he lacked the authority to terminate the Agler Green–PPS contract. Coupland testified that he: (1) acted alone in executing the termination letter; (2) never discussed matters related to the termination with HUD Director Jakob; and (3) agreed that the termination could only be effectuated by the Director (on behalf of the Secretary), which he (Coupland) was not.

The Court finds that no genuine issues of material fact exist with respect to Coupland's authority to terminate the contract. HUD produced evidence that HUD Director Jakob authorized Coupland via e-mail to act as Director from July 20–21, 1995. PPS does not dispute the validity of the delegation. PPS chooses instead to argue that it was prejudiced by the late production of the delegation e-mail. However, PPS only has itself to blame for such delay. PPS never requested any discovery regarding Coupland's authority to execute the termination. Furthermore, PPS never asked Coupland during his deposition whether he was authorized to terminate the Agler Green–PPS contract.

4. As of May 2, 1995, PPS was licensed under Ohio law to manage real estate property. The license transfer complied with § 1301:5–1–03(B) of the Ohio Administrative Code.

The Court finds that as a matter of law, HUD properly terminated the Agler Green–PPS contract pursuant to a valid exercise of authority. In addition, the conclusion that HUD properly terminated the Agreement effectively defeats any claim PPS has brought against Agler Green for breach of contract. Since the ultimate effective date of the termination of the Agreement by both parties was September 30, 1995, PPS cannot be heard to argue that an alleged breach by Agler Green harmed it in any way. Whether or not Agler's termination of the Agreement was a breach which damaged PPS is a moot point in light of HUD's termination of that Agreement. The termination by HUD of the contract rendered Agler Green's act superfluous, and therefore, meaningless as far as PPS is concerned.

## CONCLUSION

The Court finds that the original contract between Agler Green and PPS was void *ab initio* as a matter of law because PPS's failure to be properly licensed before May 2, 1995 rendered the contract illegal. The Court further finds that, if the contract was not void, but merely voidable, and later ratified by Agler Green, or if the course of conduct of Agler Green and PPS after May 2, 1995 created an implied contract, the contract was properly terminated on July 21, 1995 under the terms of that Agreement by HUD effective September 30, 1995. Agler Green's subsequent act of terminating the same Agreement on the same effective date did not damage PPS in any way. Therefore, PPS's claims for damages, and for declaratory, injunctive, and mandamus relief against HUD and Agler Green are dismissed. For the foregoing reasons, Defendants' Motions for Summary Judgment are **GRANTED**. Judgment is rendered in favor of the Defendants.

**IT IS SO ORDERED.**